JAMES McNEILLY, PROSECUTOR, v. STATE OF NEW JER-
SEY AND ROBERT V. KINKEAD, JUDGE OF THE HUD-
SON COUNTY COURT OF COMMON PLEAS, RESPOND-
ENTS.

Submitted October 5, 1937—Decided December 24, 1937.

Before Justices BODINE, HEHER and PERSKIE.

For the prosecutor, *John G. Flanigan.*

For the respondents, *James A. Hamill, Charles Hershen-
stein (Edward J. O'Mara,* of counsel).

The opinion of the court was delivered by

PERSKIE, J.   The propriety of prosecutor's conviction as
a disorderly person rests basically upon our determination of

the assault made upon the constitutionality of our act concerning disorderly persons (Revision of 1898) as lastly amended by chapter 166, *Pamph. L.* 1936, *p.* 400.

As so amended section 1, subdivision (a) thereof, now provides as follows:

"Any person who shall be apprehended either on foot or in any automobile, vehicle or public conveyance, who cannot give a good account of himself or who is engaged in an illegal occupation, and who is in this State for an unlawful purpose, shall be deemed and adjudged to be a disorderly person.

"In any prosecution under this section the fact that the person apprehended cannot give a good account of himself or is engaged in an illegal occupation shall be *prima facie* evidence that he is present in this State for an unlawful purpose."

The judgment of conviction discloses that after midnight on June 29th, 1937, two detectives of Jersey City, while on duty, observed prosecutor walking on "Central avenue in the vicinity of Griffith street;" "he was looking into windows at the time * * *;" and "seemed wandering aimlessly * * *;" he continued to walk on Central avenue as far as South street; he returned slowly to Griffith street where he "stood on the corner and looked up and down." The detectives had observed prosecutor's actions for "about forty minutes." They stopped prosecutor and questioned him. Prosecutor explained his presence in Jersey City by saying that he was a resident of Hoboken, New Jersey; that he was in that particular vicinity because he had been to a dance and had met a girl who lived in the neighborhood but he neither knew her name nor her address. The detectives observed that prosecutor carried or wore but one glove; it was for his right hand; he had none on the left hand; stones were found in his pocket. When asked to explain, prosecutor said that the glove and stones were used by him as weapons for self-protection in event of an assault upon him. Upon further inquiry, however, prosecutor admitted that he had broken windows with the glove stuffed with stones, and that he had been arrested for "breaking windows."

Prosecutor was then taken to police headquarters for further questioning. It there developed, by prosecutor's own admissions, that he did not live in Hoboken but lived in New York; that he had broken the store window of a Moe Levy store and stole suits and overcoats from the window; that he used the glove and stones to break windows to commit robbery; he, in fact, demonstrated to the men at headquarters how he broke a window with his glove stuffed with stones. He further admitted that he had an unsavory criminal record.

Upon being sworn in his own behalf prosecutor, while denying intent to do wrong at the time, admitted that there was "no special reason" for his being in New Jersey; that he was "always getting into trouble;" and that he had been "sent away" for "breaking windows and stealing." He admitted the truth of the criminal record which showed that he had been arrested in New York for burglary in 1921 and for grand larceny in 1926; that he had been sentenced to six months for attempted burglary in 1927; that he had been sentenced from three to five years in Michigan state prison in 1929 on charge of breaking and entering; that he had been sentenced to four months in the workhouse at Brooklyn, in 1931, on the charge of attempted burglary; that he had been sentenced to five years in Bronx, New York, in 1932, on the charge of burglary; and that he has been out on parole since 1935.

Obviously, the facts fully support the conviction and we are, therefore, concerned only with the points which are argued in support of the alleged unconstitutionality of the act in question.

*First:* Prosecutor contends that the act is unconstitutional because its terms and provisions are indefinite, uncertain and vague, and thus violative of the due process clause of the fourteenth amendment of our federal constitution. That contention is rested upon the premise that the act sets forth no ascertainable standard of guilt, and, therefore, does not inform a defendant of the nature and cause of the accusation against him. *United States* v. *Brewer,* 139 *U. S.* 278, 288; 35 *L. Ed.* 190; *Nash* v. *United States,* 229 *U. S.* 373; 57

*L. Ed.* 1232; *United States* v. *Cohen Grocery Co.,* 255 *U. S.* 81; 65 *L. Ed.* 516. It appears to us that these contentions are based upon a misconception of the provisions of the challenged legislation.

It is conceded, if the act provided that the only fact necessary to be proved in order to sustain a conviction as a disorderly person were that the accused "be unable to give a good account of himself" then it would be unconstitutional. This court has so held. *Archer* v. *First Criminal Judicial District Court, Bergen County,* 10 *N. J. Mis. R.* 1159; 162 *Atl. Rep.* 914. Under such a supposition the act would be subject to the criticism, made by Mr. Justice Parker who sat alone in the last cited case, that "any citizen taking a walk in the park would be liable to prosecution as a disorderly person." But the act here under review is not so limited or circumscribed. It will be observed that it sets forth an additional fact which must be proved, namely, that the accused "be present in the state for an unlawful purpose."

The case of *Archer* v. *First Criminal Judicial District Court, supra,* is unlike the instant case both as to facts and law. In the Archer case, emissaries of some religious organization were merely engaged in distributing its literature from door to door. And in that case the court had before it the Disorderly Persons act of 1928, chapter 95, page 202, which act does not contain the provision set forth in the act of 1936, *supra,* namely, that the accused "be present in the state for an unlawful purpose."

The act of 1936, *supra,* requiring, as it does, proof of the fact that the accused is "unable to give a good account of himself;" and proof of the further fact that the accused "is present in this state for an unlawful purpose," is a valid exercise of the police power of the state. It is well within the "large measure of discretion" inherent in the legislature "in creating and defining criminal offenses." *Levine* v. *State (Court of Errors and Appeals),* 110 *N. J. L.* 467, 469, 470; 166 *Atl. Rep.* 300. While the language of the act is broad, we do not share the opinion that it is either indefinite, uncertain or vague. On the contrary, we think the language

of the act evinces a clear, definite and ascertainable standard of guilt—inability of accused to give a good account of himself and his presence in the state for an unlawful purpose—applicable alike to all who may come under its provisions. (For historic review of the language used read page 1160 of the Archer case.)  The act of 1936, *supra,* is neither arbitrary nor unreasonable.  We discern in the act a clear legislative intent to nip crime in the beginning.

*Second:*  Prosecutor also contends that the act of 1936, *supra,* further trenches upon the due process clause of the fourteenth amendment of our federal constitution in that it deprives the accused of the presumption of innocence.  This contention is based upon that provision in the act which provides that the fact that the accused cannot give a good account of himself shall be *prima facie* evidence that he is present in this state for an unlawful purpose.  This provision, it is argued, is invalid because there is no rational connection between the fact proved and the fact to be presumed.  It is, of course, true that "it is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime."  *McFarland* v. *American Sugar Refining Co.,* 241 *U. S.* 79, 86; 60 *L. Ed.* 899, 904.  But it is equally true that a legislature may raise a presumption, such as is raised in the act of 1936, *supra,* provided there be "some rational connection between the fact proved and the ultimate fact presumed, and that the inference  *  *  *  shall not be so unreasonable as to be a purely arbitrary mandate."  *Mobile, Jackson and Kansas City Railroad Co.* v. *Turnipseed,* 219 *U. S.* 35, 43; 55 *L. Ed.* 78; *Adams* v. *New York,* 192 *U. S.* 585; 48 *L. Ed.* 575.  The constitutionality of reasonable legislative presumptions was recently (1936) before the Court of Appeals of New York, in the case of *People* v. *Pieri et al.,* 269 *N. Y.* 315; 199 *N. E. Rep.* 495, 498.  In that case Chief Judge Crane writes:

"One fact which must be proved by the people is left in the first instance to a presumption.  The fact that the defendant is found consorting with thieves and criminals shall be *prima facie* evidence that such consorting was for an unlawful

purpose. Is this an unreasonable or unnatural presumption? Is there not here some rational relation between the fact proved and the fact presumed? *Mobile, Jackson and Kansas City Railroad Co.* v. *Turnipseed,* 219 *U. S.* 35; 31 *S. Ct.* 136; 55 *L. Ed.* 78; 32 *L. R. A. (N. S.)* 226, *Ann. Cas.* 1912A, 463. Does not experience warn us that when evil persons associate with those who commit crime or have repeatedly been convicted of violating the law, it is all to no good purpose; such close association immediately suggests that some unlawful scheme is being concocted? Besides, the prosecution, even with the aid of this presumption, must still prove to the satisfaction of the judge, beyond a reasonable doubt, that the consorting was in reality for an unlawful purpose; the burden of proof is not shifted. *People* v. *Cannon,* 139 *N. Y.* 32; 34 *N. E. Rep.* 759; 36 *Am. St. Rep.* 668."

Each case of this type necessarily and especially depends upon the proofs. We are firmly of the opinion that there is a sufficiently rational connection, under the act in question, between the fact proved and the ultimate fact presumed. And notwithstanding the presumption supplied by the legislation, the prosecutor must, nevertheless, under all circumstances, properly prove the guilt of the accused in accordance with the standards prescribed by our law. That burden does not shift.

The challenged act trenches upon no constitutional inhibition.

The writ of *certiorari* is dismissed, and the conviction is affirmed, with costs.